THIRD DIVISION
MAY 17, 2006

1-04-2589

| | | |
|---|---|---|
| CHICAGO TRANSIT AUTHORITY, a Municipal Corporation, | ) ) ) | Appeal from the Circuit Court of Cook County. |
|     Plaintiff-Appellee and Counterdefendant-Appellee, | ) | |
|     v. | ) ) ) | |
| CLEAR CHANNEL OUTDOOR, INC., an Illinois Corporation, and ELLER MEDIA COMPANY, a Delaware Corporation, | ) ) ) | No. 02 CH 22386 |
|     Defendants-Appellants, | ) ) ) | |
| CLEAR CHANNEL OUTDOOR, INC., an Illinois Corporation, | ) ) | Honorable |
| | ) | Sophia H. Hall, |
|     Counterplaintiff-Appellant. | ) | Judge Presiding. |

JUSTICE ERICKSON delivered the opinion of the court:

This case involves a dispute concerning approximately 50 advertising sign structures or billboards located on property belonging to the Chicago Transit Authority (CTA). The billboards are the subject of five agreements between the CTA and Clear Channel Outdoor, Inc. (CCO), and its various predecessors-in-interest, including Eller Media Company (Eller). The CTA filed a six-count complaint in the circuit court of Cook County against CCO, seeking, inter alia, a declaration that it properly terminated the five agreements and was entitled to possession of the billboards. This appeal arises on the parties' motions for partial summary judgment as to counts I through III of the CTA's complaint. The circuit court granted the CTA's motion and denied CCO's cross-motion. CCO appeals, challenging both the circuit court's denial of its cross-motion for partial summary judgment and the grant of that filed by the CTA.

BACKGROUND

As this case arises from the parties' motions for summary judgment, the factual background is based on the parties' pleadings, depositions, affidavits, admissions, and exhibits. As best as can be determined from the record provided to this court, the CTA and CCO (or its predecessors-in-interest) entered into five agreements concerning the placement of billboard advertisements on CTA property. In August 2002, the CTA sought to terminate those agreements effective September 30, 2002, in order to solicit bids for a new advertising contract. The CTA solicited bids and although CCO participated in that bid process, it was not awarded the contract. Although it is the CTA's position that the five agreements with CCO were properly terminated, CCO has continued to place advertisements on those structures and has formally challenged the CTA's bid process. The CTA wants CCO off its property.

**Agreements 1 and 2**

Agreement 1 is dated August 29, 1975, and was entered into between the CTA and Foster & Kleiser, a division of Metromedia, Inc. (F&K), a predecessor-in-interest of CCO. It granted F&K a license to enter specific CTA property located at 5222-34 South Cicero Avenue "for the purpose of maintenance of one painted sign-board facing south." It also provided that the license was to commence on September 1, 1975, and continued "subject to cancellation by either party upon five (5) days written notice."

Agreement 2 was similar to Agreement 1 and provided a license to F&K for the purpose of "maintaining a painted signboard" located at the "southeast portion of the Archer-Neva Bus Terminal." Agreement 2 commenced on November 1, 1975, and, like Agreement 1, was subject to cancellation by either party upon five days' written notice.

**Agreements 3 and 4**

Agreement 3, dated December 31, 1983, was entered into by the CTA and F&K. It granted F&K "the right to install and maintain [F&K's] signboards" on specific portions of CTA property, and was to remain in effect from January 1 through December 31, 1984, unless terminated by the CTA upon 30 days' written notice. It also provided that F&K "shall remain the owner of all of said advertising signs, structures and improvements *** notwithstanding the fact that the same constitute real estate fixtures." The agreement was extended twice; once on December 31, 1984, and once on December 31, 1985.

Agreement 4, dated February 28, 1986, was entered into by the CTA and Gateway Outdoor Advertising Company (Gateway), another predecessor-in-interest of CCO, and granted Gateway the right to "install and maintain [Gateway's] signboards" on specific CTA property, and was to remain in effect from March 1, 1986, through February 28, 1987, unless terminated by the CTA upon 30 days' written notice. Like Agreement 3, Agreement 4 provided that Gateway "shall remain the owner of all of said advertising signs, structures and improvements *** notwithstanding the fact that the same constitute real estate fixtures."

**Agreement 5**

Agreement 5 was a more detailed agreement than the other four. It was entered into on March 1, 1996, by the CTA and Eller, which merged into CCO's parent company in February 1997, and was to remain in effect for an "initial term of five (5) years" until February 28, 2001. Agreement 5 was an extension or renewal of a previous five-year agreement executed on March 1, 1991, between the CTA and Patrick Media, another of CCO's predecessors-in-interest.

Relevant provisions of Agreement 5 include section 1.1, which granted Eller "the sole and exclusive rights and privileges [] to place and handle advertising by means of

displays on outdoor advertising structures (as hereinafter defined) only upon the [CTA's] elevated structures which are listed on the attached Exhibit A."  Section 1.2(a) indicated "[t]he locations covered by this Agreement shall include only those existing locations listed on the attached Exhibit A, which are already equipped with outdoor advertising structures." Section 1.2(b) stated "[t]he Chairman of the Board of the [CTA] *** may from time to time designate and consent to the use of a location or locations for advertising purposes as characterized in Article I herein, in addition to those set forth in Exhibit A."

Article 2 of the agreement, entitled "Installation Maintenance and Operation," provided in section 2.1 that "[a]ll outdoor advertising structures installed by [Eller] shall be furnished, erected and installed at sole cost to [Eller] without hampering the operations of the [CTA] or discommoding its passengers."  Section 2.1 also provided that Eller bore the cost of modifying "existing [CTA] structures," and relocating cables and other items, and that "[p]rior to beginning of work by [Eller] at any specific location, complete plans and specifications for the installation shall be submitted to the [CTA] for review and approval." That section also provided:

> "[Eller] reserves the right to erect, furnish or install such outdoor advertising structures using its own materials and employees or may elect to employ third parties or contractors (subject to the [CTA's] approval, as may be necessary) to erect, furnish and install same.  Title to such outdoor advertising structures erected, furnished or installed by or for [Eller] as aforesaid shall be and remain at all times during the term hereof the property of [Eller] and it shall have sole responsibility thereafter."

Section 9.3 indicated the agreement could be terminated at any time upon the written consent of Eller and the Chicago Transit Board.

Section 9.4(b) provided in part:

> "At the expiration or other termination of this agreement or any extension or renewal thereof, all outdoor advertising structures erected by [Eller] hereunder shall, at the option of the [CTA] become the property of the [CTA] and the [CTA] may require [Eller], at [its] sole cost and expense, to remove such of the outdoor advertising structures as the [CTA] may elect upon notice."

**Communication Between the Parties**

On October 17, 2000, CCO sent a letter to the CTA seeking at least a five-year extension upon the expiration of Agreement 5 and making several other proposals. On February 8, 2002, CCO sent the CTA a letter stating that "[a]lthough [Agreement 5] does not contain a specific renewal or extension provision, the Agreement recognizes the parties['] contemplation of entering into an extension." CCO requested a 10-year extension and stated that it was willing to assign all structures and permits to the CTA.

Because the CTA felt it to be in its best interest to put a contract for outdoor billboard advertising out for bid in order to better reflect market rates, the CTA, on March 25, 2002, sent a letter to CCO terminating all five agreements. In the letter the CTA rejected CCO's offer for a 10-year extension and additionally stated it was: (1) terminating Agreement 5 effective April 30, 2002, and intending to exercise its option under section 9.4 of that agreement to have all outdoor advertising structures covered thereunder become its property; and (2) terminating Agreements 1 through 4 effective May 31, 2002. Because

CCO refused to assign and transfer title to the structures covered by those agreements, the CTA requested that CCO remove the structures by May 31, 2002. The CTA further stated "[i]n the event CCO fails to remove the structures by the May 31, 2002 termination date, the CTA will deem the structures to be abandoned with ownership reverting to the CTA and CCO will have forfeited any right to remove the structures after the termination date."

In a letter dated April 8, 2002, CCO indicated to the CTA that because of various amendments to the City of Chicago zoning and sign ordinances, CCO would be the "sole source" that could provide advertising services to the CTA because it owned the necessary permits, and due to changes in the law, no other party would be able to obtain the necessary permits.

On April 24, 2002, CCO wrote to the CTA and indicated its intention to participate in the advertising bidding process. CCO also stated that "a temporary extension of the existing agreements might be in order, rather than abrupt termination."

On April 29, 2002, the CTA wrote to CCO and rescinded its March 25, 2002 termination notice. The CTA indicated that its intention "still is [] to go to market with a new Request for Proposals [(RFP)] on our outdoor billboard advertising." However, because the bid process had been slowed, the CTA felt "a temporary month to month extension is appropriate at this time," and "allow[ed] the outdoor billboard advertising contracts between the [CTA] and CCO to revert back to month to month terms."

On August 6, 2002, the CTA sent to CCO a second termination notice. The CTA indicated that effective September 30, 2002, it was terminating all five agreements and that: (1) it was exercising its option under section 9.4(b) of Agreement 5 to have all outdoor advertising faces and accompanying structures become CTA property; (2) "[t]he CTA continues to hold title to the faces and structure(s) under [Agreements 1 and 2]"; and (3) it

6

would not extend Agreements 3 and 4, which it referred to as "Secondary Agreements." As to Agreements 3 and 4, the CTA also stated:

> "As CCO has not agreed to assign and transfer title to the outdoor billboard faces and structures covered by [Agreements 3 and 4] and the faces and supporting structures are on CTA Property, CTA hereby instructs CCO to remove all such faces and structures from CTA property, at CCO's sole cost and expense, no later than October 31, 2002."

If CCO failed to remove the structures by that deadline, "the CTA will deem the faces and structures to be abandoned and CCO will have forfeited any right to enter CTA property to remove the faces and structures or to claim title to the faces and structures."

CCO responded in a letter dated August 14, 2002, and stated that it had the right to remove the "primary" agreement structures. The CTA, in a later letter, disagreed with this position.

On August 27, 2002, CCO sent a letter to the CTA indicating that CCO "will not exercise its right to remove the sign structures listed in your letter of August 6, 2002," and requested that the advertising contracts continue pending completion of the RFP process.

On September 13, 2002, the CTA, by letter, rejected CCO's offer to extend the agreements. In response to CCO's indication that it would not remove the structures, the CTA stated:

> "As CTA has stated before, CCO has no right to remove the structures covered by [Agreement 1, 2 or 5] all as defined in the August 6, 2002 letter. Further, as to the Secondary Agreements [Agreements 3 and 4] *** CTA does not view

7

CCO's decision to remove such structures as a right to be exercised solely at CCO's discretion. As CCO holds title to such structures but not the property on which such structures rest, CCO has an obligation to either remove, or have removed, at its sole expense, all structures covered by the Secondary Agreements. If CCO chooses not to remove those structures then, CTA will deem the structures as abandoned property and will at CTA's election either remove such structures, at CCO's expense, or allow the structures to remain as property of the CTA."

On October 28, 2002, after the September 30, 2002 termination date, the CTA sent CCO a letter demanding that it cease and desist maintaining and/or placing advertisements on CTA billboards, submit an accounting for its advertising revenues, and pay the CTA such revenues.

On November 20, 2002, CCO sent to the CTA a letter indicating that it did "not agree that the CTA/CCO Billboard Agreements are terminated."

**The Bid Process**

In September 2002, the CTA received bids for a five-year advertising contract with a possible five-year extension. Although CCO participated in the bid process, Viacom Outdoor, Inc., submitted the winning bid. On November 15, 2002, CCO filed a bid protest with the CTA, alleging that it submitted the winning bid and that no other company would be able to perform under the contract, as CCO owned the necessary permits. On November 21, 2002, CCO demanded that the CTA award it the contract and alleged the bid process was anti-competitive.

**Circuit Court Proceedings**

On December 12, 2002, the CTA filed a six-count verified complaint in the circuit court of Cook County. In count I, the CTA sought a declaration that: (1) Agreements 1 and 2 were terminated effective September 30, 2002, and that since that date CCO has had no right to possess, remove or use the Agreement 1 or 2 billboards; (2) the CTA was entitled to "the immediate right, title, possession and use" of the Agreement 1 and 2 billboards; (3) any future use of the billboards by CCO without the CTA's written consent would constitute a trespass; and (4) the CTA's removal of the Agreement 1 and 2 billboards after September 30, 2002, would not infringe upon or violate any of CCO's rights. Count II sought similar relief regarding Agreements 3 and 4, and count III sought similar relief regarding Agreement 5. Counts IV (trespass), V (tortious interference with prospective economic opportunity) and VI (accounting for revenues by CCO) are not at issue in this appeal.

CCO, on September 18, 2003, filed an amended verified counterclaim for mandamus, declaratory judgment and permanent injunction, alleging the CTA's bid solicitation process was improper and that it should be awarded the new advertising contract.

During the proceedings, the parties entered a stipulation indicating CCO would continue to pay the CTA for the use of the billboards.

The CTA sought summary judgment on counts I through III of its complaint, arguing that it properly terminated the agreements effective September 30, 2002, and that since that date it had "the sole right to possess and control the billboards." CCO also moved for partial summary judgment, arguing that because it owned the structures, it could remove them prior to the agreements being terminated. CCO asserted that none of the agreements transferred ownership to the CTA upon termination and that the CTA's refusal

9

to allow CCO to remove the Agreement 1, 2 and 5 structures rendered its termination incomplete. CCO also argued that the CTA was legislatively prohibited under the Metropolitan Transit Authority Act (Transit Act) (70 ILCS 3605/1 et seq. (West 2002)) from owning the structures.

The circuit court, on May 12, 2004, ruled that the agreements were properly terminated and that CCO had no ownership interest in the structures or any right to remove them. Construing CCO's ownership claim as a "defense" to the CTA's termination, the court ruled that it was unnecessary to decide whether the CTA could in fact own the structures under the Transit Act. It entered partial summary judgment in favor of the CTA on counts I, II, and III of its complaint, and denied CCO's cross-motion. Noticeably absent from the circuit court's order was any language stating that the CTA was entitled to possession of the billboards.

The circuit court subsequently denied CCO's motion to reconsider, made a finding that there was "no just reason to delay enforcement or appeal or both" of its May 12, 2004 decision pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)), and clarified that "[t]hough the Court finds that [CCO] has no right or interest to the subject billboards, it has not found whether the CTA owns these billboards because such an issue is not necessary for the Court to decide at this time." The court also granted CCO's motion to waive presentment of bond and to stay enforcement of the judgment, and stayed the remaining issues and counts in the circuit court "pending resolution of the [Rule] 304(a) appeal."

CCO timely appeals the grant of the CTA's motion and the denial of its own.

ANALYSIS

CCO challenges the circuit court's denial of its cross-motion for partial summary judgment, asserting that the court erred when it found that CCO had no ownership interest

10

in the sign structures covered by the five agreements. CCO also challenges the grant of partial summary judgment in favor of the CTA and asserts that there remains an issue of fact as to whether the five agreements were terminated.[1] The CTA responds that: (1) CCO waived any claims of ownership it had in the structures under all five agreements in its August 27, 2002 letter; (2) CCO failed to meet its burden to support its claim that it owned the structures; and (3) the agreements were properly terminated.

Motions for partial summary judgment are appropriate, as the circuit court may grant summary judgment on all or any part of the relief sought. See Brewer v. Daubert Chemical Co., 72 Ill. App. 3d 718, 721, 391 N.E.2d 110 (1979). The purpose of summary judgment is to determine whether there exists any genuine issue of material fact between the parties. Wolfram Partnership, Ltd. v. LaSalle National Bank, 328 Ill. App. 3d 207, 215, 765 N.E.2d 1012 (2001) (Wolfram). Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits reveal there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2002); Sklodowski v. Countrywide Home Loans, Inc., 358 Ill. App. 3d 696, 699-700, 832 N.E.2d 189 (2005). Although summary judgment can aid in the expeditious disposition of lawsuits, it is a drastic

---

[1]CCO also pursued in its opening brief its contention that the Transit Act prohibits the CTA from owning the structures. However, as CCO conceded at oral argument that we need not address this issue, we do not.

measure that should be allowed only where "the right of the moving party is clear and free from doubt." Purtill v. Hess, 111 Ill. 2d 229, 240, 489 N.E.2d 867 (1986).

A triable issue of fact exists where there is a dispute regarding material facts or where reasonable persons may draw different inferences from the undisputed material facts. Petrovich v. Share Health Plan of Illinois, Inc., 188 Ill. 2d 17, 31, 719 N.E.2d 756 (1999); Wolfram, 328 Ill. App. 3d at 215. This court's function on review of summary judgment is limited to deciding whether the circuit court correctly concluded that no genuine issue of material fact had been raised and, if none was raised, whether judgment as a matter of law was appropriate. William Blair & Co. v. FI Liquidation Corp., 358 Ill. App. 3d 324, 333, 830 N.E.2d 760 (2005) (Blair). To determine whether there exists a genuine issue of material fact, this court must construe the evidence strictly against the movant and liberally in favor of the opponent. Blair, 358 Ill. App. 3d at 333. "When parties file cross-motions for summary judgment, the court is invited to decide the issue on summary judgment as a matter of law; however, summary judgment is nevertheless inappropriate if factual questions regarding a material issue exist." Blair, 358 Ill. App. 3d at 334.

In summary judgment proceedings, it is the moving party who bears the initial burden of production and the ultimate burden of persuasion. Wortel v. Somerset Industries, Inc., 331 Ill. App. 3d 895, 900, 770 N.E.2d 1211 (2002) (Wortel), citing Williams v. Covenant Medical Center, 316 Ill. App. 3d 682, 737 N.E.2d 662 (2000) (Williams). If the movant meets this initial burden of production, the burden then shifts to the nonmoving party to produce evidence raising a genuine issue of material fact. Williams, 316 Ill. App. 3d at 689. "The party opposing summary judgment need not prove [its] case to defeat the motion, but must present some factual basis that would arguably entitle [it] to judgment." Blair, 358 Ill. App. 3d at 333. In this case, as both parties have filed motions for partial

summary judgment, the respective burden falls on them as appropriate. General Auto Service Station v. Maniatis, 328 Ill. App. 3d 537, 548 n.6, 765 N.E.2d 1176 (2002).

The denial of a motion for summary judgment is generally not appealable. Arangold Corp. v. Zehnder, 187 Ill. 2d 341, 357, 718 N.E.2d 191 (1999) (Arangold). However, an exception exists where, as here, both parties have filed motions for summary judgment on the same claim. Arangold, 187 Ill. 2d at 358. This court's review is de novo. Canal Insurance v. A & R Transportation & Warehouse, LLC., 357 Ill. App. 3d 305, 309, 827 N.E.2d 942 (2005).

**Count I: Agreements 1 and 2**

Having discussed the relevant summary judgment rules and standards, we conclude that the circuit court properly granted the CTA's motion for partial summary judgment as to count I of its complaint. The CTA moved for summary judgment, asserting that it properly terminated Agreements 1 and 2, and that it was therefore entitled to "the sole right to possess and control" the subject billboards. As the movant on the termination and possession issues, the CTA had the initial burden to produce evidence demonstrating the agreements were properly terminated and that it was entitled to possession of the structures. Wortel, 331 Ill. App. 3d at 900. The CTA relied on, among other things, the language of those agreements, which provided they could be terminated upon five days' written notice by the CTA, and the written correspondence between the parties, including its August 6, 2002 termination notice.

In response to the CTA's motion as to count I, CCO asserted the "CTA's purported termination is inconsistent with its refusal to allow [CCO] to exercise its right to remove the structures upon termination. It is undisputed that the structures covered by Agreements 1 and 2 are owned by [CCO] and its predecessors-in-interest." CCO, however, cited to no

13

supporting documentation to support this claim, and the record does not reveal that any exists. Rather, the language of the agreements makes clear that the Agreement 1 and Agreement 2 structures were in existence prior to the execution of those agreements. Thus, CCO, the nonmoving party on the issue of termination and possession, has not met its burden of producing evidence to show that a genuine issue of material fact exists. Therefore, summary judgment in favor of the CTA was properly granted as to count I.

As CCO conceded at oral argument that its cross-motion for partial summary judgment was properly denied as it failed to meet its burden of producing evidence to establish as a matter of law that it owned the Agreement 1 and 2 structures, no further discussion on this issue is warranted.

**Counts II and III:  Agreements 3, 4 and 5**

The issues of whether the CTA's motion for summary judgment was properly granted as to counts II and III, and whether CCO's cross-motion for summary judgment on those claims was properly denied, are less clear, and the circuit court's order as to counts II and III highlights the cumbersome nature of the pleadings and the less than ideal state of the record on appeal.  At issue includes: (1) whether the CTA, as the movant on the issues of whether it properly terminated Agreements 3, 4 and 5 and was entitled to "sole possession and control of [those] billboards," produced sufficient evidence to show it was entitled to judgment as a matter of law; (2) whether CCO, as the movant in its cross-motion for summary judgment, produced sufficient evidence to show it was entitled to judgment as a matter of law on the issue that it owned the Agreement 3, 4 and 5 structures; and (3) whether the CTA was required to file suit under the Forcible Entry and Detainer Act (735 ILCS 5/9-101 et seq. (West 2002)) to maintain its cause.

We first reject CCO's contention that because Agreements 3, 4 and 5 are leases and

not licenses, the CTA was required to file a complaint under, and follow the relevant procedures of, the Forcible Entry and Detainer Act in order to terminate those agreements, and that its failure to do so deprived the circuit court of jurisdiction. While that Act does provide the complete remedy for settling disputes about real property (People v. Evans, 163 Ill. App. 3d 561, 564, 516 N.E.2d 817 (1987)), the case upon which CCO relies to support its jurisdictional argument, Russell v. Howe, 293 Ill. App. 3d 293, 688 N.E.2d 375 (1997) (Russell), is distinguishable. In this case, unlike in Russell, the circuit court did not enter an order for possession of real property; rather, the circuit court determined that the CTA was entitled to declaratory judgment on counts I, II and III of its complaint. We find that CCO has waived any claim that Agreements 3, 4 and 5 are leases and that the Forcible Entry and Detainer Act applies in this case by failing to raise this contention in its opening brief in violation of Supreme Court Rule 341(e)(7) (Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(7), eff. October 1, 2001). We also note that in its motion to reconsider the grant of summary judgment in favor of the CTA, CCO expressly told the court that the CTA was not required to file suit under the Forcible Entry and Detainer Act. We will not permit CCO to now change its position in this court. See In re Detention of Swope, 213 Ill. 2d 210, 217, 821 N.E.2d 283 (2004) ("a party cannot complain of error which that party induced the court to make or to which that party consented"); People v. Hill, 345 Ill. App. 3d 620, 633, 803 N.E.2d 138 (2003) (discussing the doctrine of invited error).

We next address the contentions properly before this court. To show that Agreements 3, 4 and 5 were properly terminated and that it was entitled to sole possession and control of those billboards, the CTA, in its motion for partial summary judgment, relied on the fact that Agreements 3 and 4 were terminable upon 30 days' written notice, and that

15

its August 6, 2002 notice terminating those agreements effective September 30, 2002, complied with them. As to Agreement 5, the CTA argued that agreement had expired on February 28, 2001, and, as evidenced by the parties' communications, had continued since then on a monthly basis, and that its August 6, 2002 notice properly terminated that agreement.

In its cross-motion for summary judgment, CCO stated the structures covered by Agreements 3, 4 and 5 have "been continuously owned by [CCO] and its predecessors-in-interest." The only support CCO provided for this assertion was the absence of any provision in Agreements 3 and 4 transferring ownership to the CTA upon termination, and its contention that although paragraph 9.4(b) of Agreement 5 gave the CTA the option upon expiration to have "all outdoor advertising structures erected by [Eller] hereunder *** become the property of the [CTA]," this provision was ineffective as no structures were erected after the agreement was executed.

In its reply in support of its own motion and in opposition to CCO's motion, the CTA acknowledged that the language of Agreements 3 and 4 stated CCO's predecessor-in-interest owned the structures. The CTA argued that CCO, in its August 27, 2002 letter where it stated "[w]e wish to advise you that [CCO] will not exercise its right to remove the sign structures listed in your letter of August 6, 2002," waived its right to possess the billboards.

As to the Agreement 5 structures, the CTA relied on the language of that agreement, including section 9.4(b), to show that those structures listed in the attached Exhibit A transferred to the CTA at its option.

We conclude that the circuit court properly denied CCO's motion for partial summary judgment as to counts II and III. CCO, as the movant on the issue that it owned the

Agreement 3, 4 and 5 structures, had the burden of producing evidence to show it was entitled to judgment as a matter of law. See Paul H. Schwendener, Inc. v. Jupiter Electric Co., 358 Ill. App. 3d 65, 78, 829 N.E.2d 818 (2005) (Schwendener). CCO did not meet this burden. Although CCO repeatedly states that it has always owned the Agreement 3, 4 and 5 structures, that this issue has never been disputed by the parties, and that none of the agreements transferred ownership to the CTA, CCO has not provided sufficient evidence to establish this claim as a matter of law. Even if we were to construe CCO's claim of ownership as an affirmative defense, we find that CCO has failed to meet its burden of establishing its factual position on this defense. See Soderlund Brothers, Inc. v. Carrier Corp., 278 Ill. App. 3d 606, 615, 663 N.E.2d 1 (1995). Thus, CCO's cross-motion for partial summary judgment was properly denied as to counts II and III.

What remains at issue is whether the CTA's motion was properly granted as to counts II and III. The CTA filed its motion seeking summary judgment on the issues that the agreements were properly terminated and that it was entitled to possession of the billboard structures. Thus, the CTA, as the movant on these issues, had the burden of producing sufficient evidence to establish it was entitled to judgment as a matter of law. While the CTA, by pointing to the language of the agreements and its August 6, 2002 termination notice, may have produced sufficient evidence to sustain its burden of proof to demonstrate it properly terminated the agreements, the CTA did not produce sufficient evidence to establish as a matter of law that it was entitled to sole possession and control of the Agreement 3, 4 and 5 structures.

We believe there remains a genuine issue of material fact regarding whether the CTA is entitled to possession and control of the Agreement 3 and 4 billboards. Both agreements state CCO's predecessor-in-interest "shall remain the owner of all said

advertising signs, structures and improvements."  The CTA, in its September 13, 2002 letter, clearly states that, in its view, CCO holds title to the Agreement 3 and 4 structures. The CTA, however, argues CCO waived any right to title to these billboards in its August 27, 2002 letter.  However, it is unclear whether CCO, in its August 27 letter, intended to waive its right to title in the Agreement 3 and 4 billboards, or if CCO intended to waive its right to take them down.  We thus find that under the circumstances in this case, whether CCO intended to waive its ownership rights to the Agreement 3 and 4 structures remains a question of fact.  See In re Liquidation of Inter-American Insurance Co. of Illinois, 329 Ill. App. 3d 606, 619, 768 N.E.2d 182 (2002) (Inter-American) ("[w]hether waiver has occurred is a question of fact when the material facts are in dispute or where reasonable minds might differ in the inferences to be drawn from undisputed facts").  Therefore, summary judgment as to count II was improperly granted in favor of the CTA.

We also believe there remains a genuine issue of material fact regarding whether the CTA is entitled to possession and control of the Agreement 5 structures.  It does not appear from the record that anytime prior to this litigation, the parties ever discussed, or thought to clarify, who in fact owned, had title to, or was entitled to possession upon termination, of the Agreement 5 structures, and the evidence in the record supporting the parties' motions for summary judgment is slight.  The language of the agreement is not helpful.  Section 1.2(a) states "[t]he locations covered by this Agreement shall include only those existing locations listed on the attached Exhibit A, which are already equipped with outdoor advertising structures."  Thus, it seems that the structures listed on the attached Exhibit A were in existence prior to the execution of Agreement 5.  The CTA, in its verified answer to CCO's counterclaim, also admitted that those structures were built by Patrick Media.  As evidenced by sections 1.2(b) and 2.1, the parties contemplated that additional

billboards not listed in Exhibit A may be built with the CTA's consent. Article 2, entitled "Installation Maintenance and Operation" states, in section 2.1, that "[t]itle to such outdoor advertising structures erected, furnished or installed by or for [Eller] as aforesaid shall be and remain at all times during the term hereof the property of [Eller] and it shall have sole responsibility thereafter."

Thus, Agreement 5 indicates that the structures, apparently built by Patrick Media, were pre-existing. It also discusses the possibility of Eller erecting new structures. However, the parties agree no new structures were built. The language of section 2.1 states Eller has title to all structures it erected, furnished or installed. However, it is unclear whether section 2.1 refers to the structures listed in the attached Exhibit A, or if it refers only to any new structures Eller might build.

The CTA, abandoning its contention asserted in the circuit court that it is entitled to possession of the Agreement 5 structures under paragraph 9.4(b), argues CCO, in its August 27, 2002 letter, also waived its claimed ownership rights in the Agreement 5 structures. At oral argument, the CTA also asserted that it is entitled to possession of the billboards because it can be presumed that because the structures are located on CTA property, it owns them. We reject both claims.

First, the CTA points to no authority to support its presumption-of-ownership claim. The cases we have found that may support such a notion, including Ennis v. Lamb, 10 Ill. App. 447, 453 (1882), and Dinet v. Eilert, 9 Ill. App. 644, 647 (1882) (both stating that there exists a presumption that where a house is located on the land of an individual, that individual is prima facie the owner of the house), are of questionable value as they are concerned with realty, not sign structures, and were decided more than 100 years ago. See Bryson v. News America Publications, Inc., 174 Ill. 2d 77, 95, 672 N.E.2d 1207 (1996)

19

(noting appellate court decisions issued prior to 1935 are not binding authority and that decisions more than 100 years old may be especially questionable).

Second, we disagree with the CTA's assertion that CCO's August 27, 2002 letter waived its right to the Agreement 5 structures. We question whether the August 27 letter even discusses the Agreement 5 structures. The CTA, in its August 6, 2002 letter, stated it was exercising its 9.4(b) option to have the Agreement 5 structures become its property, and did not state that CCO could remove them. Moreover, the CTA's September 13, 2002 letter, which was written in response to CCO's letter of August 27, states that "CCO has no right to remove the structures covered by [Agreement 1, 2 or 5]." However, even if we were to agree with the CTA's contention that the Agreement 5 structures were addressed in CCO's August 27, 2002 letter, as discussed above, whether that letter demonstrates that CCO intended to waive its rights to those structures remains a question of fact. See In re Inter-American, 329 Ill. App. 3d at 619. Therefore, summary judgment in favor of the CTA was improperly granted as to count III.

## CONCLUSION

For the reasons stated above, we affirm the circuit court's denial of CCO's motion for partial summary judgment in its entirety and affirm the circuit court's grant of partial summary judgment in favor of the CTA on count I. We reverse the circuit court's grant of summary judgment in favor of the CTA on counts II and III and remand the cause for further proceedings.

Affirmed in part and reversed in part; cause remanded.

HOFFMAN, P.J., and THEIS, J., concur.